```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA


PRADEEP PATIL                                        CIVIL ACTION


v.                                                   NO. 18-6167


AMBER LAGOON SHIPPING GmbH                           SECTION "F"
& CO., ET AL.
```

ORDER AND REASONS

The plaintiff Pradeep Patil sues for personal injuries he sustained in a slip-and-fall accident aboard the M/V AMBER LAGOON, a vessel owned and operated by the defendants. Before the Court is the defendants' motion for summary judgment and a corresponding dismissal of all of Patil's claims. For the reasons that follow, the motion is GRANTED.

**Background**

The record in this case contains the following uncontroverted facts.

On March 17, 2016, Pradeep Patil – a seasoned[1] marine engineer employed as a surveyor by Maritech Commercial, Inc., which in turn

---

[1] Patil has forty-five years' experience in the maritime industry. A 1976 graduate of an Indian maritime engineering college, Patil sailed for roughly sixteen years before achieving the title of "Chief Engineer." In 1992, he left the high seas to

1

was independently contracted to run tests on the M/V AMBER LAGOON – came aboard the AMBER LAGOON to assess the watertightness of the ship's hatch covers (or "holds") through a process known as ultrasonic testing. In general terms, ultrasonic testing requires a tester – in this case, Patil – to point a testing wand at a vessel's hatch covers so that ultrasonic sound waves can enable the tester to detect deficiencies in the hatch cover's seal.

After successfully testing the AMBER LAGOON's other holds, Patil came to the vessel's "Hold Number 4" around 6:00 PM. With the port access ladder he would have preferably used to return to the ship's main deck blocked by cargo containers, Patil decided to cross from the port side of the hold to the starboard side of the hold. This crossing would require Patil to scale an approximately 36-inch gap from one ledge to another. In order to traverse the gap, Patil sat down on the one side and attempted to place his foot onto the other. At some point in his attempted negotiation of such maneuver, Patil's plant foot slipped and he fell roughly six feet to the main deck. The blow from Patil's fall was sufficiently severe to knock his hard hat off his head – which

---

become the "Marine Superintendent" of Barber Ship Management, and has since been employed in a variety of senior roles in the industry.

2

caused him to suffer a small forehead laceration – and fracture his left heel.

Bystanders rushed to Patil's assistance, rendering him prompt first aid and summoning emergency medical personnel in an admittedly non-negligent manner. Subsequent tests revealed the aforementioned forehead cut and heel fracture to be Patil's only injuries as a result of the accident, but the fracture sidelined Patil from work for three months and required a November 2016 surgery.

Patil filed this personal injury action some two years later. At primary issue is the cause of Patil's slip, which presumably caused his fall and injury. Patil alleges that a slippery foreign substance on the negligently maintained "Hold Number 4" caused his right foot to slip and sent him crashing to the main deck. As his primary evidence on this point, Patil testifies that in the days following the accident, he observed an admittedly unpronounced spot of lubricant on the steel-toe boots he wore that day.

The defendants see matters differently. For one, they doubt that any such substance was in fact present on "Hold Number 4" when the incident occurred: indeed, as they insist, (1) the "contemporaneous and 'close-in-time' Harris County EMS records and [the] incident report [of Patil's employer] . . . make no mention

3

of any slip hazard or foreign substance," (2) Patil continues to admit that he did not actually *see* any such substance on or around the hatch that day, (3) Sebastian Kedziora, Patil's admittedly younger and more sprightly inspection companion (or "mate") suffered no such mishap and could not attest to seeing any hazardous foreign substance either, (4) Patil admitted it was still daylight when his fall occurred, and (5) Patil's "diverse experience in the oceangoing marine industry" would surely have allowed him to "learn[] very early on in his career . . . how to identify, address and/or avoid the presence of any alleged oil or grease in his work area or path." See Mot. at 1-7.

In any event, the defendants argue that whatever the merits of Patil's theory of the incident as a factual matter, Patil's claim nevertheless fails as a legal matter because Patil cannot show that the defendants breached any of the narrowly circumscribed duties of care imposed on vessel owners by 33 U.S.C. § 905(b). The defendants' correctness or incorrectness in that argument is the ultimate subject of this motion for summary judgment.

I.

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate where the record reveals no genuine dispute as to any material fact such that the moving party is entitled to

4

judgment as a matter of law. No genuine dispute of fact exists where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). A genuine dispute of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The Supreme Court has emphasized that the mere assertion of a factual dispute does not defeat an otherwise properly supported motion. See id. Therefore, where contradictory "evidence is merely colorable, or is not significantly probative," summary judgment remains appropriate. Id. at 249–50 (citation omitted). Likewise, summary judgment is appropriate where the party opposing the motion fails to establish an essential element of his case. See Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). In this regard, the nonmoving party must do more than simply deny the allegations raised by the moving party. See Donaghey v. Ocean Drilling & Expl. Co., 974 F.2d 646, 649 (5th Cir. 1992). Instead, it must come forward with competent evidence, such as affidavits or depositions, to buttress its competing claim. Id. Hearsay evidence and unsworn documents that cannot be presented in a form that would be admissible at trial do not qualify as competent

opposing evidence.  FED. R. CIV. P. 56(c)(2); Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547, 549 (5th Cir. 1987) (per curiam).

Finally, in evaluating a summary judgment motion, the Court must read the facts in the light most favorable to the nonmoving party.  Anderson, 477 U.S. at 255.

## II.

Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.  Urged at this later stage in the proceedings, the defendants' motion for summary judgment reads and functions like a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted.  In essence, the defendants assert that the undisputed facts in the record, even when read in the light most favorable to Patil, do not establish that Patil has a plausible claim for relief against the defendants.  If the defendants are correct, then the Court must indeed grant summary judgment in their favor and dismiss Patil's claims as legally baseless.  See id.

The Court thus proceeds to evaluate Patil's ability to state a valid legal claim on the developed factual record at hand.

A.

The Longshore and Harbor Workers' Compensation Act (LHWCA) is a federal statute which "establishes a workers' compensation program for longshoremen and other maritime workers injured or killed in work-related accidents." Tauzier v. East, 183 F. Supp. 3d 768, 779 (E.D. La. 2016). Notably, the LHWCA supplies the "*exclusive* remedy" for employees seeking work accident-related compensation from their employers. Id. (emphasis added). "However, although the LHWCA provides the exclusive remedies against employers and generally leaves them immune from suits in tort, it also provides a cause of action against a vessel owner for vessel negligence under [33 U.S.C.] § 905(b)." Id.

Here, it is undisputed that Patil worked aboard the AMBER LAGOON as an independent contractor rather than an employee. It is also undisputed that Patil was a covered worker under the LHWCA because he was a "person engaged in maritime employment" at the time of the accident at issue. See 33 U.S.C. § 902(3). Accordingly, as both sides acknowledge, Patil's "exclusive remedy against [the] defendants . . . is a negligence action" under § 905(b). See, e.g., Opp. at 5. As interpreted by the Supreme

7

Court and the Fifth Circuit, § 905(b) sharply narrows the theories of liability that injured workers like Patil may pursue against vessel owners. Indeed, as another section of this court has noted, "[t]he scope of vessel negligence under § 905(b) is limited to the breach of specific duties described by the U.S. Supreme Court in Scindia Steam Navigation Co. v. De Los Santos," 451 U.S. 156 (1981). Tauzier, 183 F. Supp. 3d at 779.

Those "specific duties" are narrow and threefold. First, a vessel owner has a "turnover duty" to (1) "turn over the vessel and its equipment in such a condition that an expert stevedore can perform stevedoring operations with reasonable safety," and (2) "warn the stevedore of hidden or latent dangers that are known or should be known to the vessel owner."[2] Id. at 780. Second, a vessel owner has a "duty to exercise reasonable care in the areas of the ship under the active control of the vessel." Id. And third, a vessel owner has a "duty to intervene," which "is narrow and requires 'something more' than mere shipowner knowledge of a dangerous condition." See id. at 780–81 (quoting Singleton v. Guangzhou Ocean Shipping Co., 79 F.3d 26, 28 (5th Cir. 1996)).

---

[2] "However, a vessel owner is not liable if a danger is (1) open and obvious or (2) such that a reasonably competent stevedore should anticipate encountering it." Tauzier, 183 F. Supp. 3d at 780.

8

B.

The defendants argue that summary judgment must be granted in their favor because Patil cannot state a plausible claim for violations of any of the foregoing vessel-owner duties on the developed factual record at hand. Cf. Celotex, 477 U.S. at 322. The Court agrees.

As the defendants observe, the only § 905(b) duty that Patil's complaint realistically implicates is the turnover duty.[3] This Court has summarized the law on the turnover duty as follows:

---

[3] The "active control" duty and the "duty to intervene" do not supply Patil plausible theories of recovery in this case.

For one, there is no evidence that the defendants exerted active control "over the actual methods and operative details" of Patil's ultrasonic testing on the AMBER LAGOON, which is "a prerequisite to vessel liability" under the "active control" Scindia duty. See Clay v. Daiichi Shipping, 74 F. Supp. 2d 665, 673 (E.D. La. 1999). Rather, the uncontroverted evidence establishes that the defendant reasonably left Patil – an experienced and knowledgeable independent contractor – to his own devices and expertise. Indeed, Patil chose to conduct his testing and move about the vessel in the manner in which he saw fit, and the defendants are correct that Patil had every right to ask his employer or the defendants for equipment or assistance that would better enable his safe performance of the testing duties his employer assigned him. As a general rule, a contractor in the defendants' position is "under no duty to protect [contract workers] from risks that were inherent in" carrying out the contract. See West v. United States, 361 U.S. 118, 123 (1959).

Patil concedes his inability to state a claim under the "active control" duty, but instead points to the related "active involvement" duty referenced in the same breath in Scindia. On that point, Patil cites the Scindia Court's observation "that a

9

> The turnover duty has two parts. First, a vessel owner has a duty to exercise "ordinary care under the circumstances and to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety." Scindia, 451 U.S. at 167. Second, a vessel owner has a

vessel owner 'may be liable if it actively involves itself in the cargo operations and negligently injures a longshoreman.'" See Opp. at 18 (quoting Scindia, 451 U.S. at 167). While that is surely a fair quotation and binding rule of law, it is inapposite here. Patil argues that the defendants "actively involve[d]" themselves in his performance of his duties by obstructing the access ladder he would have ordinarily (and ideally) used for ingress and egress from "Hold Number 4." However, even if the crew's unrelated activities aboard the ship that day tended to make Patil's job more challenging, it cannot be said that such activities amount to the defendants "actively involving" or inserting themselves into Patil's activities.

Likewise, Patil cannot successfully invoke the even narrower "duty to intervene." Even if Patil could meet his burden of proving that the presence of a slippery substance on "Hold Number 4" did in fact cause his fall – which is questionable – that is only half of the bargain. Indeed, this district court has applied Fifth Circuit precedent to require that a plaintiff in Patil's position show that, among other things, the vessel "had 'actual knowledge that it could not rely on the [contractor] to protect its employees and that if unremedied the [hazardous condition at issue] posed a substantial risk of danger." Tauzier, 183 F. Supp. 3d at 784 (quoting Pimental v. LTD Canadian Pac. Bul, 965 F.2d 13, 17 (5th Cir. 1992)). Here, there is little evidence that any foreign substance was indeed present on "Hold Number 4" – let alone that the defendants knew or should have known about it, or further still that the defendants had actual knowledge that they could not rely on Patil or his employer to take their own precautions or steer clear of the hazardous condition. See Pimental, 965 F.2d at 17; cf. Wilson v. Alexander's Power Shipping Co., 1993 WL 664472, at *2 (S.D. Ga. Nov. 15, 1993) (granting summary judgment to similarly situated defendant because, among other reasons, "oil and grease are commonly present on a vessel's weather deck, and . . . an experienced and expert stevedore would anticipate their presence").

10

> duty to warn "the stevedore of any hazards on the ship or with respect to its equipment that are known to the vessel or should be known to it in the exercise of reasonable care." Id. This duty is narrow, however, and does not "include dangers which are either: (1) open and obvious or (2) dangers a reasonably competent stevedore should anticipate encountering." Kirksey v. Tonghai Mar., 535 F.3d 388, 392 (5th Cir. 2008) (citing [Howlett v. Birkdale Shipping Co., 512 U.S. 92, 98 (1994)]).
>
> Once the vessel has been turned over to the stevedore, the vessel owner has no general duty to supervise or inspect the operations; instead, the vessel owner may rely on the stevedore to fulfill its [own] statutory duty under 33 U.S.C. § 941 to provide a reasonably safe work environment for the longshoremen. Scindia, 451 U.S. at 168-69. Hence, "the shipowner is not liable to the longshoremen for injuries caused by dangers unknown to the owner and about which he had no duty to inform himself." Id. at 172. Thus, once the vessel owner turns over the ship to the stevedore, only the duty to control and the duty to intervene apply. Id. at 167, 175.

Duvall v. Bopco, L.P., 2015 WL 7458608, at *3 (E.D. La. Nov. 24, 2015).

Patil's turnover-duty claim fails under these standards. For starters, any lurking substance on "Hold Number 4" was not only unknown to the defendants through exercise of reasonable diligence – recall that neither Patil nor Kedziora *saw* any such foreign agent on the hold before the accident – but, more importantly, clearly not of such a nature that "an expert and experienced" actor like Patil would not have "be[en] able by the exercise of reasonable care to carry on [his] operations with *reasonable* safety." See

11

Scindia, 451 U.S. at 167 (emphasis added). *Reasonableness* is the metric by which the defendants are to be judged, not *perfection*, and this fact narrows Patil's path to recovery substantially.

Furthermore, even when viewed in the light most favorable to Patil – which is to say, even assuming that a slick foreign substance did indeed present an unreasonable hazard to any individual stepping foot on "Hold Number 4" at the moment of Patil's accident – the record simply does not support a finding that the defendants failed "to exercise 'ordinary care under the circumstances'" by keeping the ship and "Hold Number 4" in sufficiently reasonable repair that an experienced worker like Patil could safely perform his tests and move about the ship. See id. Indeed, as Patil admitted at his deposition, he did not actually *see* any hazardous substance on "Hold Number 4," and although such may be the nature of any latent danger, it bears noting that Kedziora too noticed no such hazard. Thus, as an initial matter, it is doubtful that Patil could meet his burden of demonstrating both the existence of a hazardous slippery substance *and* the defendants' negligence in failing to perceive and correct it when Patil – an expert contractor charged with exercising his own degree of reasonable care – failed to do so himself.

12

Assume, however, that Patil *could* prevail on that issue. Would not the nature of Patil's task aboard the AMBER LAGOON and Patil's relationship with the defendants render his turnover-duty claim equally unviable? Indeed, the law of this circuit provides that once a vessel has been turned over to a covered worker, the vessel owner may rely on the worker's employer to take its own statutorily required precautions. <u>See, e.g.</u>, <u>id.</u> In this case, Patil came aboard the AMBER LAGOON to perform specific tests on the vessel's hatch coverings, and the defendants reasonably left him to do so in his own expert way. The defendants had every right to do so and had no general or overriding duty to ensure Patil's safety from an unknown hazard – which, if it even existed, was hardly unreasonable and easily anticipatable on a ship.

This discussion may shroud an even more fundamental point, however: the record contains precious little evidence that any foreign agent in fact caused Patil's slip in the first place. As the defendants note, the narrow nature of the turnover duty led the Fifth Circuit to affirm a district court's summary rejection of largely indistinguishable claims in <u>Kitchens v. Stolt Tankers B.V.</u>, 657 F. App'x 248 (5th Cir. 2016) (per curiam). There, the court held that "[i]n light of his failure to produce any evidence of a hazard on the walkway" in which he slipped and fell, the

13

plaintiff's "conclusion that he slipped 'because of accumulation of veg oil or other foreign substances on the walkway . . .' is nothing more than unsupported speculation and therefore insufficient to defeat a motion for summary judgment." Id. at 252 (citing Brown v. City of Houston, 337 F.3d 539, 541 (5th Cir. 2003) ("Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment.")).

Patil's remaining arguments – namely, that there is a material factual question as to whether the defendants were negligent in blocking an access ladder to "Hold Number 4," or in Kedziora's failure to alert Patil to an agent of which he had no knowledge, or somehow direct or assist Patil – are unavailing under the particularized legal regime Congress has created under the LHWCA.

\*   \*   \*

Patil's inability to state a plausible claim for relief on the developed factual record at hand compels the Court's dismissal of his claims.

Accordingly, IT IS ORDERED: that the defendants' motion for summary judgment is GRANTED and the plaintiff's claims are DISMISSED WITH PREJUDICE.

14

New Orleans, Louisiana, December 9, 2020

_____
MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE

15